**UNITED STATES of America**

v.

**Clement BURFORD, a/k/a "Penko,"
a/k/a "Boss," a/k/a "Bill Hurst,"
et al., Defendants.**

**No. 90 Cr. 424(LBS).**

United States District Court,
S.D. New York.

Jan. 28, 1991.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (David N. Kelley, Nancy Northup, of counsel), for U.S.

Lawrence K. Feitell, New York City (Trevor L. Brooks, David Gordon and Lorin Duckman, New York City, of counsel), for defendants.

## OPINION

SAND, District Judge.

This criminal action comes before the Court on an indictment against twenty defendants who were allegedly involved in a conspiracy to violate the narcotics laws of the United States. A number of the individuals named in the indictment have entered guilty pleas. Only six defendants remain in the case. There are presently four motions before the Court. First, Ms. Elaine Stewart, Mr. Everton Courtney Smith and Mr. David Jason Morrison move to suppress certain evidence obtained by the government through electronic surveillance. Second, Ms. Stewart moves to be severed from the trial of her co-defendants. Third, Ms. Stewart moves to obtain access to grand jury minutes and related information. Finally, Ms. Stewart challenges the admissibility of consensual recordings. For the reasons stated below, all of defendants' motions are denied.

## BACKGROUND

On June 28, 1990, a Grand Jury sitting in the Southern District of New York returned an eight count indictment charging nineteen defendants with participation in an extensive cocaine conspiracy and six defendants with involvement in a marijuana conspiracy. Various other counts charged a number of the defendants with substantive counts of distributing both cocaine and marijuana. The organization, led by Mr. Clement Burford and Mr. Donavan Tulloch, shipped and transported drugs from Jamaica to New York. From New York, the drugs were distributed to various states around the country.

During the course of the investigation, which lasted approximately from August, 1989 to June, 1990, law enforcement officials gathered evidence using both normal investigative techniques and electronic surveillance. The investigation began with physical surveillance and undercover operations and terminated after the use of wiretaps and pen registers. At or after the arrests, law enforcement officers seized U.S. currency, cocaine, crack, firearms and papers related to the narcotics operation. All of defendants' motions are to suppress various evidence the government obtained during the process of investigating the "Burford Operation".

## DISCUSSION

I. *Suppression of Evidence Obtained from Electronic Surveillance*

█ The government utilized two forms of electronic surveillance in this case. Wiretaps and pen registers were attached to one Maryland telephone and three New York telephones. Standing to challenge evidence obtained through the use of electronic surveillance techniques requires a showing by a defendant that his or her voice was heard on the wire or that his or her telephone was tapped. *United States v. Fury*, 554 F.2d 522, 525 (2d Cir.1977). Although the defendants have moved jointly to suppress the evidence obtained through electronic surveillance, the Court will only consider the claims of those defendants that have standing, based on whether they were in fact intercepted.

A. Wire Taps

█ The wiretap that is being challenged in this motion is that which was connected to the Maryland telephone. Mr. Everton Smith, the defendant remaining who was heard on this wire, is the only individual with standing to challenge the wiretap or-

der. Mr. Smith advances both a statutory and a constitutional argument in support of his claim that the evidence gathered from the wiretap should be suppressed. Specifically, he alleges that Judge Carter of the Southern District of New York, who issued the surveillance order, had no jurisdiction to authorize "seizure" of information from a telephone located in Maryland. For the reasons discussed below, Mr. Smith's motion is denied.

The procedural and jurisdictional requirements for obtaining authorization for wiretapping and other forms of electronic surveillance are set forth in the Omnibus Crime Control and Safe Street Acts ("Title III"), 18 U.S.C. §§ 2510–2521 (1989). Section 2518(3) provides that a "judge may enter an ex parte order ... authorizing or approving interception of wire, oral or electronic communications within the territorial jurisdiction of the court in which the judge is sitting." For jurisdictional purposes the question is where the interception occurred. Interception is defined in the statute as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

The Second Circuit has not addressed specifically questions of jurisdiction involved in wiretapping and other forms of electronic surveillance. Case law in this district, however, suggests that for jurisdictional purposes "aural" acquisition means where the communication is actually heard. See United States v. Rodriguez, 734 F.Supp. 116, 120 (S.D.N.Y.1990). Other courts, although addressing slightly different issues, have concluded that a communication is intercepted both where the original signal is detected and again where it is aurally acquired—that is, where a Drug Enforcement Agent ("DEA") listens to the tapes. See United States v. Shields, 675 F.2d 1152, 1156 (11th Cir.1982); United States v. Turk, 526 F.2d 654, 658 (5th Cir.) (aural acquisition is to be given a broad reading), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

The underlying policies of Title III support the reasoning and holdings of the above cases. In enacting this statutory scheme the Congress addressed two concerns. First, the statute aims to alleviate the divergent practices among different jurisdictions in seeking and executing wiretap orders. See United States v. Giordano, 416 U.S. 505, 520, 94 S.Ct. 1820, 1829, 40 L.Ed.2d 341 (1973); Adams v. Lankford, 788 F.2d 1493, 1498 (11th Cir.1986). A second policy of Title III is to protect individual privacy rights. While the Congress recognized the need for the government to use electronic surveillance devices, it was also concerned about abuses to an individual's right to privacy in the home. See Giordano, 416 U.S. at 520, 94 S.Ct. at 1829. Protecting unwarranted intrusion into an individual's privacy is enhanced when orders are issued and wires are intercepted in one jurisdiction.

Applying the statutory language, policies and case law to the instant case, this Court holds that no jurisdictional defect exists. The government intercepted conversations over a Maryland telephone line pursuant to a May 22, 1990 order issued by Judge Carter. All conversations that occurred on this telephone line over a period of a couple of months were monitored by agents of the DEA who were located in New York. The tapped telephone was actually located in Maryland but a "slave" device connected it to a long distance line, established by the government, to route all calls to the "wire room" located in the Southern District of New York where they were heard and recorded.

This Court believes that Judge Carter had the authority to issue the May 22, 1990 order and finds no basis for suggesting that any jurisdictional defects arise from the electronic devices utilized by the government. The term "[i]ntercept", as defined in the statute, does not require the eavesdropper or issuer of the wiretap order to be located in the same jurisdiction as the tapped line. Since the information was actually heard in a wire room in New York through the use of a "slave" device, the interception occurred in this jurisdiction. This result is in keeping with the statutory

language and the underlying policy concerns of Title III. In a case such as this one, which involves wiretaps in two states, abuses involving privacy rights are more difficult to monitor if different courts are issuing wiretap orders.

The defendant advances two arguments in support of his motion that the May 22, 1990 order issued by Judge Carter was beyond the court's territorial jurisdiction and that all evidence obtained from the surveillance should be suppressed. First, relying on *Weinberg v. United States*, 126 F.2d 1004 (2d Cir.1942), defendant urges that under Art. III, Section 2 and the Sixth Amendment of the United States Constitution, a district court is without power to issue search warrants or wiretap orders that reach beyond the territorial limits of its district. While *Weinberg* does stand for the proposition that as a general rule search warrants must be used in the jurisdiction where they are issued, we find this argument unpersuasive as applied to electronic surveillance. Search warrants are issued to permit seizure of tangible physical evidence which is, by definition, in only one location. Wiretaps, in contrast, involve seizure of transitory intangible evidence. This is not a situation where Judge Carter authorized a seizure of the telephone in Maryland, as would be the analogous situation to the fact pattern in the *Weinberg* case. Rather, these were conversations that began in Maryland and were aurally acquired, or seized, in New York.

Defendant's second argument, based on issues of statutory interpretation, suggests that the determinative question is where the slave device is located. Defendant argues that under the statutory language of 18 U.S.C. § 2510(4), which requires "acquisition ... through the use of any electronic device or mechanical device", the seizure occurred in Maryland because the slave device was used in Maryland and not New York. Therefore, defendant argues that Judge Carter had no jurisdiction to issue the order. This interpretation of section 2510(4) gives a new meaning to the statutory language that is not supported by the legislative history or case law. Jurisdiction vests either in the location where the conversations are actually heard or where the mechanical device is inserted. Therefore defendant Smith's motion to exclude the evidence is denied.

### B. Pen Registers

■ Once again, Mr. Smith is the only defendant with standing to challenge the pen register surveillance because he is the only defendant affected by the pen registers at issue. The government used pen registers for both the Maryland and Brooklyn telephones. In this motion, however, the only challenge is to the use of pen registers for the Maryland telephone based on jurisdictional defects. Mr. Smith, in essence, advances the same jurisdictional arguments against the government's use of pen registers as those urged to suppress information obtained from the wiretaps.

The installation and use of pen registers is controlled by Section 3123 of Title 18, which allows courts to "enter an *ex parte* order authorizing the installation and use of a pen register within the jurisdiction of the court ..." Unlike the wire tapping statute, where significant issues of privacy are at stake, this law is "intended merely to safeguard against purely random use of this device." *United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir.1990).

Applying this statute to the present case, this Court believes that an appropriate government official applied to a United States Magistrate for a valid order that was within his scope to issue. The telephones that the government monitored were in Brooklyn and Maryland but the pen register devices were physically located in New York. The pen register for the Brooklyn telephone was located on the New York wire that the DEA had established to conduct surveillance of Mr. Burford's Mount Vernon home. The device for the Maryland telephone was actually in the DEA headquarters in Manhattan. Since the pen registers in both instances were "installed and used" in New York, even though one of the telephones was located in Maryland, this Court finds no jurisdictional defect. For these reasons, defendant Smith's motion to suppress the evi-

dence obtained from the use of pen registers is denied.

### C. Timeliness of sealing "Burford–2" audio recording of intercepted tapes

The "Burford–2" intercepted tapes were one set of wiretaps that the government collected during the investigation of the "Burford Operation." Mr. Smith is again the only remaining defendant who was intercepted on these particular tapes and as such is the only individual with standing to challenge the timeliness of the sealing. The defendant argues that the government did not seal the tapes within the required time period and as such the tapes are inadmissible.

The Second Circuit has clearly outlined the analysis for considering the timeliness of sealing audio recordings obtained through electronic surveillance. The applicable statute, 18 U.S.C. § 2518(8)(a), requires that the fruits of an electronic surveillance order be turned over to the issuing judge for sealing "[i]mmediately upon the expiration of the period of the order." Without the seal or a legitimate explanation, the tapes are not admissible into evidence. *United States v. Massino*, 784 F.2d 153, 156 (2d Cir.1986). Any delay in sealing beyond two days requires a "satisfactory explanation" by the government. *See United States v. Vazquez*, 605 F.2d 1269, 1274 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979).

There is no bright line rule for determining whether the government has met its burden of providing a satisfactory explanation for any delay in sealing tapes. Courts have considered a variety of factors, depending on the type of case, the length of the investigation and whether there was any evidence of bad faith by the government. *See Vazquez*, 605 F.2d at 1279 (shortage of qualified personnel to translate conversations, equipment shortages and necessity to duplicate explained delay ranging from seven to thirteen days); *United States v. McGrath*, 622 F.2d 36, 43 (2d Cir.1980) (need to transport tapes from Binghampton to Albany excused three to eight day delay).

In this case, the government finished the wiretaps late on Friday afternoon of June 15, 1991. Because Judge Carter was unavailable on the next business day, Monday, June 18, 1991, the government made an application to Judge Louis L. Stanton, the Part One judge in the Southern District of New York. By 3:30 p.m. on June 18th, Judge Stanton ordered that the 59 tapes from the Burford–2 phone be sealed and held in the custody of the Drug Enforcement Administration. The tapes were then sealed in the presence of Judge Stanton. Since the government sealed the tapes on the first business day after the surveillance was terminated, there is no legitimate basis for excluding the tapes from evidence.

### D. Adequacy of normal investigative procedures and need for electronic surveillance

Since this portion of the motion is a challenge to the investigative techniques used by the government, any defendant who was heard on any wiretap has standing to challenge the procedures employed. Defendants Elaine Stewart, Everton Courtney Smith and David Morrison move to suppress the evidence obtained from the wires on the ground that normal investigative procedures were not exhausted. Implicit in the argument is that Judge Carter abused his discretion in issuing the wiretap orders based on an inadequate showing by the government of a need to use electronic surveillance. We find this argument unpersuasive.

Before a court may grant the government permission to intercept a wire or any other oral communication it must be shown, by a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried ..." 18 U.S.C. § 2518(1)(b). The Supreme Court has held that this requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S.

143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). Traditional surveillance techniques need not be exhausted if it is reasonable to assume that they are "impractical or costly and inconvenient." *United States v. Lilla,* 699 F.2d 99, 102 (2d Cir.1983). Nonetheless, electronic surveillance, with its accompanying implications for individual privacy, may not be used routinely without some showing of need by law enforcement. *See United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974).

■ The federal statute does not require that any particular investigative procedures be exhausted, but rather that the showing be tested "in a practical and common sense fashion." S.Rep. No. 1097, 90th Cong., 2d Sess. 101, *reprinted in* 1968 U.S. Code Cong. & Ad.News 2112, 2190. *See United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.) (in major New York City drug conspiracy, ongoing nonwiretap surveillance had become increasingly unsuccessful), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *United States v. Fury,* 554 F.2d 522, 530 (1977) (subjects "difficult to tail because they were very careful and constantly changing routes"); *Vazquez,* 605 F.2d at 1282 (interviewing informants, conducting physical surveillance and checking bank, telephone and other records showed that normal investigative techniques were exhausted). In each of these cases the courts granted an order to use electronic surveillance even though the use of a wiretap was not absolutely the last resort.

■ In the present action the government made applications for wiretap orders to Judge Carter which were supported by the affidavits of special agents Timothy Corley and Adele Hanay. In his affidavit, Mr. Corley, to demonstrate the inadequacy of normal investigative techniques, describes a number of problems that law enforcement encountered in infiltrating this criminal enterprise. First, there was the difficulty of using physical surveillance as a successful investigative means. For example, Mr. Clement Burford would conduct meetings in a cloak room, making it impossible to overhear conversations or conduct surveillance. Further, observation posts were not available at the Burford residence in New York due to the layout of the buildings. ¶ 142(a). Pen registers and telephone toll records, although useful to the investigation, only showed that conversations occurred and offered no assistance as to who was involved in the conspiracy. ¶ 142(c). Similarly, the use of informants had been unhelpful. Undercover agents and informants had not been able to infiltrate the high levels of the organization or identify sources or supplies. ¶ 142(e)(f). Ms. Adele Hanay in her affidavit identified the same types of difficulties.

Defendants argue that important privacy issues were at stake and that the government misled Judge Carter, especially in suggesting that informants were not making any progress in identifying how the Burford organization was operating. Further, defendants urge that physical surveillance was possible and that the government was gaining valuable information about the operation. Even if what the defense alleges is partially correct, there is no requirement that the government exhaust any particular investigative procedure before a wiretap may be authorized. The facts presented to this Court fully support the requirement that traditional investigative techniques must be exhausted. The defendants' motion is denied.

E.   Minimization

■ It is well settled law in this Circuit that to have standing to challenge improper minimization during a wiretap executed by the government, that a defendant must show a direct privacy interest. *Fury,* 554 F.2d at 526. The primary way to show a direct injury to a privacy interest is to establish a possessory or proprietary interest in the premises on which the subject telephone is located. *See Hinton,* 543 F.2d at 1011–12 n. 13 ("only those persons who have a privacy interest in the residence in which the tapped phone is located have standing"); *Rodriguez,* 734 F.Supp. at 123. The only telephones involved in this investigation were in the homes of Mr. Burford

and Mr. Tulloch. None of the remaining defendants have any possessory or proprietary interest in these properties. Consequently, we shall not address this contention any further.

## II. *Severance*

■ The only defendant moving to sever her trial from that of her co-defendants is Ms. Stewart. In essence she urges that she is less culpable than her co-conspirators and will be prejudiced by a joint trial. Citing Fed.R.Crim.P. 14, Ms. Stewart suggests that "justice requires" a separate trial. For the reasons stated below, Ms. Stewart's motion to sever is denied.

Under Fed.R.Crim.P. 8(b), multiple defendants may be joined for trial "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." A conspiracy charge "provides a common link and demonstrates the existence of a common plan" for purposes of Rule 8(b). *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). If, however, a joinder of parties will be prejudicial to either the government or a defendant, the court at its discretion may order separate trials. Fed.R.Crim.P. 14.

In this instance, every remaining defendant in the case is charged in the conspiracy count of the indictment. Specifically, it is alleged that Ms. Stewart negotiated and attempted to purchase cocaine for leaders of the conspiracy in April and May, 1990. As a result, if this Court were to grant Ms. Stewart's severance motion virtually all of the evidence admitted in the joint trial would be admissible against her in a separate trial as acts of her co-conspirators in furtherance of the conspiracy. *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984). Ms. Stewart may have been a less active member of the conspiracy, but nonetheless she is alleged to be a fully implicated conspirator.

Furthermore, this Court finds no overriding prejudice to the defendant by the joinder such that she would be denied a constitutionally fair trial. *United States v. Burke,* 700 F.2d 70, 83 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987) (to prevail, a defendant must establish that a miscarriage of justice will occur). For these reasons, and on the basis of judicial economy, Ms. Stewart's motion to sever is denied.

## III. *Entitlement to Grand Jury Minutes*

Again, this motion is made only by Ms. Stewart. Based on Fed.R.Crim.P. 6(e), Ms. Stewart argues that the evidence before the grand jury was not legally sufficient to establish "commission of any of the offenses with which she is being charged or any lesser included offense." E. Smith Br. at 5. Further, Ms. Stewart suggests the indictment is "overly broad, vague and failed to pinpoint with any accuracy the defendant's action ... which would constitute the crimes charged." *Id.* To resolve what she suggested was an ambiguity in the evidence used to indict her, Ms. Stewart requests the use of grand jury minutes. For the reasons discussed below, Ms. Stewart's motion is denied.

■ In the absence of any showing of "particularized need, or a gross and prejudicial irregularity influencing the grand jury, or some similar compelling reason," a defendant's motion to have the Court inspect the grand jury minutes should be denied. *United States v. Cummings,* 49 F.R.D. 160, 161 (S.D.N.Y.1969); *United States v. Mechanik,* 475 U.S. 66, 75, 106 S.Ct. 938, 944, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring) ("grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process"). Before a court will disrupt the traditional secrecy surrounding grand jury proceeding, a defendant must show evidence of an irregularity and not merely make a statement on information and belief. *United States v. Wilson,* 565 F.Supp. 1416, 1436–37 (S.D.N.Y.1983).

The defendant has offered no proof of irregularities before the Grand Jury in this case. Without articulating any factual basis, Ms. Stewart claims "upon information and belief ... the indictment was based on incompetent and insufficient evidence" that was lacking in "substantial or rationally persuasive evidence submitted to the grand jury." E. Stewart Br. at 6. On this basis, Ms. Stewart urges that she is entitled to inspect the grand jury minutes. *Id.* at 7. Given the presumption of validity of grand jury proceedings and the defendant's failure to present particularized proof of wrongdoing by the government, her motion for discovery of grand jury matters is denied.

IV. *Consensual Recordings*

This final portion of the motion is brought by Ms. Stewart. Her argument that the consensual recordings obtained by the government should be suppressed is without merit. It is well settled law that oral communication is excepted from the Title III requirements of prior judicial authorization when "one of the parties to the communication has given prior consent" to the interception. 18 U.S.C. § 2511(2)(c); *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). In this case the confidential informant was cooperating with the government. The informant who met Ms. Stewart in April and recorded their conversation was the same person she met in May to purchase cocaine. The informant's continuing cooperation with the government and knowledge of the recording is tantamount to his consent to record conversations he had with Ms. Stewart. Therefore, the motion to suppress the evidence obtained from these conversations is denied.

For the reasons above, all motions to suppress are denied.

SO ORDERED.